John DOE, Jane Doe, Joseph Doe, Plaintiffs,

v.

Dr. Gregory ANRIG, Massachusetts Commissioner of Education, Defendant.

John ANGIER, Judith Angier, and John Angier, Jr., Plaintiffs,

v.

Dr. Gregory ANRIG, Massachusetts Commissioner of Education, and the Wayland School Department, Defendants.

TOWN OF BURLINGTON and the School Committee for the Town of Burlington, Plaintiffs,

v.

The DEPARTMENT OF EDUCATION OF the COMMONWEALTH OF MASSACHUSETTS and John Doe, as he is father and next friend of John Doe, Jr., Defendants.

Civ. A. Nos. 79–909–Z(A), 79–2144–T(A) and 80–0359–Z(A).

United States District Court, D. Massachusetts.

March 7, 1983.

Anne M. Vohl, Burlington, Mass., David Berman, John F. Zamparelli, Town Counsel, Medford, Mass., for plaintiffs.

Linda M. Irvin, Terry Jean Seligmann, Asst. Atty. Gen., Boston, Mass., for defendants.

\* Sitting by designation.

1. This is not true as to *Wayland,* but is assumed in the parents' favor for purposes of

Diana S. Gondek, Boston, Mass., for School Committee of Westwood.

Gerald B. Gallagher, Acton, Mass., David Rosenberg, Hill & Barlow, Boston, Mass., for defendant John Doe and John Doe, Jr.

Ellen Janos, Asst. Atty. Gen., Boston, Mass., for defendant Dept. of Educ.

Jeffery Jones, Palmer & Dodge, Boston, Mass., for Town of Wayland School Committee.

Bruce E. Mohl, Asst. Atty. Gen., Boston, Mass., Jim Oliver, Boston, Mass., John Graceffa, Weymouth, for Anrig.

## OPINION

BAILEY ALDRICH, Senior Circuit Judge.*

This opinion consolidates three cases raising questions of the right to reimbursement for tuition and travel expenses for handicapped children paid during review proceedings testing the correctness of the school committee's educational and placement decision. The statutes involved are the Education for All Handicapped Children Act (EAHCA), 20 U.S.C. §§ 1401 *et seq.,* and its counterpart, Mass.G.L. c. 71B (Massachusetts law). The cases embraced are the *Town of Burlington v. Department of Education,* 1 Cir., 1981, 655 F.2d 428 (*Burlington*), here on remand; *Doe v. Anrig,* 1 Cir., 1982, 692 F.2d 800 (*Westwood*), also on remand; and *Angier v. Anrig (Wayland),* a new case. *Burlington's* child is Michael, *Westwood's* is John, and *Wayland's* is Junior. All are admittedly handicapped; their correct placement has been finally determined,[1] and the only remaining issue is reimbursement.

*Facts*

*Burlington*

During the school years 1977–78 and 1978–79 Michael experienced learning problems in the second and third grades at a

Wayland's present motion for summary judgment.

public school, Memorial. An IEP was prepared for him in the spring of 1979 for a special program at another public school, Pine Glen. The father sought review by the Department of Education's Bureau of Special Education Appeals (BSEA). Prior to the commencement of the hearings in September, he transferred Michael, at his expense, to Carroll School, a private school specially qualified to teach handicapped children. In January, 1980 the BSEA upheld his decision and ordered the town to repay him for past, and to pay the future Carroll tuition, informing the town that it might seek review in either state or federal court. The town responded with an appeal to this court, naming the Department and the father, with one count seeking EAHCA review, and a pendent count seeking a state type review. It sought, unsuccessfully, a stay of the BSEA's order requiring it to make interim payments to Carroll, and appealed from that ruling. (Appeal # 1) When threatened by the Department with a cut-off of all special education funds, the town agreed, without prejudice, to make the current, but not past, payments. On the merits, the court thereafter granted summary judgment against plaintiff town on the state count, concluding that the BSEA's decision was supported by substantial evidence. The town appealed that order as well. (Appeal # 2) Subsequently defendants obtained a preliminary injunction enforcing the BSEA's order to reimburse past tuition without awaiting final determination. The town appealed therefrom. (Appeal # 3)

Thus there were three appeals which the court took, aided by a certification under F.R.Civ.P. 54(b), prior to a trial on the merits of the federal count as to the appropriateness of Michael's IEP. The court's first action was to order a dismissal, on the merits, of the pendent state count, Appeal # 2. The state standard of review of an agency decision is the customary one, requiring the petitioner to show the decision was unsupported by substantial evidence. The special federal review under section 1415(e)(2), a provision apparently drawn by proponents of judicial activism, calls for a full trial de novo, with additional evidence, the court to make its own factual determination based on a preponderance of the evidence.[2] Pointing out that a state type review could lead to an affirmance of the BSEA's decision, while an EAHCA review could produce a reversal, on Appeal # 2 the court held that such inconsistency would violate the federal act. The state count was accordingly dismissed, leaving the federal count for trial.

On Appeal # 1 the court upheld the denial of the stay, ruling that the town had not shown irreparable harm, viz., had not shown that the father would not be able to repay the tuition if he ultimately lost. Similarly, on Appeal # 3 the court ruled the father had not shown irreparable harm in not being reimbursed forthwith for past tuition. The whole tenor of the opinion in remanding for trial of the federal count on the merits was that reimbursement could be had, either by the father or by the town depending on the ultimate finding. Follow-

2.  The writer of this opinion in no way minimizes the importance of providing special education for handicapped children. However, with the enormous demands, criminal, for which there must be a speedy trial, and civil of all sorts, upon a limited number of federal judges, the concept that each handicapped child in the country who is receiving federal aid should be entitled, after he has already received a comprehensive agency hearing and a formal review, *see* Mass.G.L. c. 71B, § 3; 20 U.S.C. § 1415(b)(2) & (c), to a trial de novo of the appropriateness of his allotment seems entirely out of balance with national demands. In the *Burlington* case alone, for one child, there were 577 pages of administrative transcript, considerable documentary evidence, and new live expert testimony, together submitted to the court for a full redetermination. The activities of counsel led to 198 docket entries prior to the first appeal, with over 100 more to date. Admittedly this is unusual, but counsel entitled to trials de novo are often not given to restraint.

By the same token, the statute is self-defeating. An IEP determination necessarily calls for prompt implementation. The statute, quite properly, calls for a continuation of the status quo until final review. Section 1415(e)(3), post. As a practical matter, one may ask in how many cases will a trial de novo be accomplished before the pertinency of the IEP has expired?

ing remand and a trial, another judge of this court found the town's IEP to have been appropriate for all three years and, accordingly, ruled that the town was "not responsible for the cost of Michael's education at the Carroll School for the academic years 1979–80 through 1981–82." For reasons that will be come to, both parties, however, seek reimbursement for what they have paid.

*Westwood*

John's disability—Down's Syndrome—was so severe that he had been maintained almost since birth at Crystal Springs School, a residential facility, at his parents' expense. In 1975 they sought an IEP, hoping to pass some of this expense on to the town. Westwood's first response was an IEP for non-residential placement in public school after a final transition year of continued residential placement. The parents objected to this, and the parties negotiated a cost-sharing agreement for continued placement at Crystal Springs. In September, 1977 the parents requested a new IEP, and on November 15 one was issued for non-residential placement in a public school, commencing immediately. The parents rejected this second IEP and appealed to the BSEA, which in due course found the IEP generally appropriate. The parents sought review in this court. At all times John remained at Crystal Springs. After trial, the district court's opinion stated that a residential placement was appropriate for the year 1977–78, and that the town was responsible for the tuition and expenses for that year. The judgment said nothing about reimbursement.

On appeal the court affirmed the district court's Crystal Springs placement decision, but discovered problems with respect to reimbursement. First, it held that section 1415(e)(3), requiring interim continuance of placement, had nothing to do with the eventual settling of accounts. The court then turned to section 1415(e)(2) and declined to construe its authorization language, to "grant such relief as . . . is appropriate," as providing for reimbursement. Rather, the court ruled that although the parents would

have been relieved of all expense had the town made the correct decision in the first place, they could not now be awarded reimbursement. For this it cited *Anderson v. Thompson,* 7 Cir., 1981, 658 F.2d 1205, a case, it so happened, from the visiting writing judge's circuit. The court stated that the First Circuit had never considered this issue before, making no mention of its apparent rulings in *Burlington.*

Again citing *Anderson v. Thompson,* the *Westwood* court indicated there could be two exceptions to its general ruling against reimbursement; one, if the change effected by the parents was necessary to protect the physical health of the child, and two, if "the school officials have acted in bad faith by egregiously failing to comply with the procedural provisions of the Act." 692 F.2d ante, at 811. Admittedly, neither exception was presented.

The court then turned to the pendent state claim, and observed that Massachusetts permitted reimbursement in some instances, citing *Amherst-Pelham Regional School Committee v. Department of Education,* 1978, 376 Mass. 480, 381 N.E.2d 922. Pointing out that the present circumstances were somewhat different, the court said that it would not decide the Massachusetts law itself, and remanded for that purpose. The court failed to note that in *Burlington* it had ordered the pendent state count dismissed because of conflict and consequent preemption.

*Wayland*

During the fall of 1977 Junior, a second grade student at Loker, a public school, was placed in a diagnostic IEP, and in December was given an IEP which the parents accepted for the time being although, contrary to the statutory requirements, they had been excluded from the hearing. The IEP called for continued placement, but with special services, at Loker. The winter of 1978 did not go smoothly, with Junior unable to perform school work adequately. Wayland recommended an outside summer program, at the parents' expense. Junior undertook a program at Carroll School. In August the parents rejected the 1977 IEP, and shortly

thereafter enrolled Junior at Carroll for the 1978–79 school year. They requested funding for an independent evaluation of Junior at the Children's Hospital. When this was refused they proceeded with the evaluation nevertheless, and submitted it to Wayland on November 2, 1978. On November 27, they inquired why no IEP was being prepared, and only on January 19, 1979 did Wayland produce a new one. This varied little from the former, and, again, the parents had not been notified to participate. They immediately rejected this plan, and appealed to the BSEA. No hearing was held until April, and as soon as it started the officer disqualified himself. The hearing was recommenced in June. While it was progressing Wayland submitted IEP # 3 for the forthcoming year to the parents, again with little change. This time the parents were given a week's notification of the hearing by mail, but on receipt they replied, by telephone, that it did not give them time to consult with their attorney, who was away, and that they did not feel they should attend without her advice. Wayland made no apparent effort to reschedule, and again prepared an IEP without the parents' involvement, who then rejected it.

The BSEA thereafter held for Wayland, ruling that, despite various procedural violations, Wayland's second and third IEPs were appropriate. The parents filed suit in this court in October, 1979. Wayland conducted no review for the years 1980–81 and 1981–82. For 1982–83 the parents requested an IEP relating to reentry by Junior into public school, and an IEP acceptable to both parties was arrived at and initiated.

### Procedural Matters

#### Pendent Jurisdiction

■ The state law claims, to the extent that any exist, are so tied in, both factually and legally, with the federal claims that the court, in the exercise of its discretion, declines to dismiss any on the ground of insufficient pendent jurisdiction.

### Certification

Some of the parties wish questions to be certified to the Massachusetts Supreme Judicial Court, and the Court of Appeals has indicated, in *Westwood,* but not dictated, that this might be done. The court has considered the matter, but declines to do so, in part because, until the Court of Appeals has resolved all the federal questions raised herein, it will be difficult to be sure just what questions it might be desirable to certify.

### Issues

#### Burlington

(1) The father seeks reimbursement for the 1979–80 tuition he paid to Carroll, as well as 1979–80 travel expense, and

(2) seeks town payment of the balance of 1981–82 tuition owed Carroll.

(3) The town seeks reimbursement for the Carroll tuition and travel expense it paid for in 1980–81 and 1981–82 as a result of the ultimately reversed BSEA order and the Department's threat to cut off all funds.

Involved in these issues is the question whether Michael's transfer to, and continued placement at, Carroll was in violation of section 1415(e)(3).

#### Westwood

John's placement at Crystal Springs, although contrary to the IEP, preceded it. Accordingly, this continuing placement was required by section 1415(e)(3). However, when it finally proved to be correct, the town declined to reimburse the parents for the expenses which, had it made a proper IEP, it would have been obliged to pay from the beginning. This presents the question of the parents' right of reimbursement, (4) under federal law, and (5) under Massachusetts law.

#### Wayland

The parents, after the IEP, and contrary to section 1415(e)(3), transferred Junior to Carroll. The BSEA upheld the IEP. In this court the parents seek to overturn the BSEA and the IEP and obtain reimbursement for the Carroll tuition and travel ex-

pense. The town moves for summary judgment, arguing that even if after a hearing on the merits this court should reverse the IEP, the parents would not be entitled to reimbursement. Accordingly, question (6) is whether the parents, having made a transfer contrary to section 1415(e)(3), nevertheless may in the particular circumstances recover tuition if their choice is ultimately upheld.

*Conclusions*

*Burlington*

If this court were to follow the language and seeming rationale of the court's *Burlington* opinion, the answers to all three questions would seem plain, and to depend simply on who was the ultimate winner with respect to the IEP, viz., the town. The father contends otherwise. In view of the complexities raised, questions (1)–(3) will be left to last.

*Westwood*

With the greatest respect, this court states that it finds itself unhappy with the Court of Appeals' decision in this case. John's parents were in a bind. Under section 1415(e)(3) they were clearly entitled, as the court recognized, to retain John in his placement at Crystal Springs, but were obliged, under the existing cost agreement, to continue to pay John's expenses. Indeed, but for the agreement, they would have had to pay tuition as well.[3] To have moved him to public school, pending review, would have effected exactly the interruption section 1415(e)(3) was designed to prevent, and would have seriously diminished the value of their success, if they achieved it, viz., by the interruption of two transfers. However, when it was determined that Crystal Springs was, substantively as well as procedurally, the correct placement, the court says that, at least under federal law, the parents must still foot the bill. Having in mind that, in addition, they must pay coun-

sel, this is surely a Pyhrric victory. Although the court noted that section 1415(e)(2) permits the court "to grant such relief as . . . is appropriate," it held, without discussion, except to rely on *Anderson v. Thompson,* ante, and *Miener v. Missouri,* 8 Cir., 1982, 673 F.2d 969, *cert. denied,* —— U.S. ——, ——, 103 S.Ct. 215, 230, 74 L.Ed.2d 171 which followed *Anderson,* that it was not appropriate to require the town to pay what it properly should have paid in the first place.

If one looks to *Anderson v. Thompson,* for the reason for this result, it is that the court found no Congressional intent to subject towns to claims for "damages." Extrapolating largely from the shortness of available funds, the *Anderson* court concluded,

> "When a school district makes a good faith effort to provide a child with an appropriate education, we do not believe that as a general rule it is good policy to require that a school district pay money damages if it later turns out that a different programming decision should have been made.

>     . . . .

> "[A] general damage remedy would hinder rather than help the very children for whose benefit the statute was enacted." 658 F.2d, ante, at 1213.

In this court's opinion, with respect, the *Anderson* court failed adequately to note the difference between general damages, which could be a very serious matter, and reimbursement for tuition payments that would have been the town's responsibility under the appropriate IEP. For the successful parent to be left with what should have been the town's bill ab initio does not seem a municipal protection that Congress would have intended, however great the shortage of funds. For a further discussion

---

**3.** "Section 1415(e)(3) is designed to preserve the status quo pending resolution of administrative and judicial proceedings under the Act. It amounts to an automatic stay preventing any change in a child's location and educational program, except by agreement of the parties.

The section has been interpreted—correctly, we think—to require that whoever was paying for the placement prior to review shall continue to do so while review is pending." 692 F.2d, ante, at 810. (Citation omitted.)

and citation of cases, *see Matthews v. Ambach*, W.D.N.Y., 1982, 552 F.Supp. 1273, 1278–79.

■ This court, while it would hope that the Court of Appeals might reconsider its *Westwood* decision, is bound thereby, and can do nothing for the parents under EAHCA, question (4), and so turns to its instruction to consider the Massachusetts law, question (5).[4] Reimbursement to the successful parent was ordered in *Amherst-Pelham Regional School Committee v. Department of Education*, 1978, 376 Mass. 480, 381 N.E.2d 922. It is true that the court granted relief based on a regulation that provided for reimbursement if the BSEA upheld the parents' decision, whereas, in the present case, the BSEA did not and it was this court that did so. However, there had been a claim even in *Amherst-Pelham* against the regulation, as going beyond the statute, and the court stated that it would give deference to the agency's views that reimbursement furthers the statutory aims. This court believes that the Massachusetts court would continue that approach, and construe the regulation as embracing a decision of this court when it, although not the BSEA, determines that the IEP should have adopted the parents' view. It holds for the parents on the pendent Massachusetts count, question (5).

*Wayland*

■ The court has no difficulty in deciding question (6) in favor of the parents, in spite of their having disregarded the IEP, as it considers the case to fall squarely within the second *Anderson v. Thompson* exception, if "school officials have acted in bad faith by egregiously failing to comply with the procedural provisions of the Act," recognized in the *Westwood* opinion, 692 F.2d, ante, at 811. Obviously every procedural violation does not equal bad faith. On the other hand, some specified proce-

dures may be so important, substantively, that subjective good faith, even if there were such, cannot protect against gross disregard. The presence of parents with their input is of utmost importance for the child's sake, and perhaps for their own as well. It is provided in the Massachusetts regulation, 603 C.M.R. § 311.7, that a parent "shall" be a member of the TEAM. The federal regulation further provides, 34 C.F.R. § 300.345,

> Parent Participation.
>
> (a) Each public agency shall take steps to insure that one or both of the parents of the handicapped child are present at each meeting or are afforded the opportunity to participate, including:
>
> (1) Notifying parents of the meeting early enough to insure that they will have an opportunity to attend; and
>
> (2) Scheduling the meeting at a mutually agreed on time and place.

Wayland gave the parents no notification whatever of the 1978 meeting. It gave only short notice in 1979, and apparently made no attempt to postpone. In addition, 34 C.F.R. § 300.343, requires annual review of the IEP. This requirement, too, was violated, since no meetings with respect to Junior were conducted between June, 1979 and spring, 1982.

The primary importance of the Act's procedural safeguards was pointed out in *Anderson v. Thompson*, 658 F.2d, ante, at 1211, 1214. *See, also, Board of Education v. Rowley* (1982) —— U.S. —— & n. 6, 102 S.Ct. 3034 & n. 6, 73 L.Ed.2d 690. To reward Wayland for their flagrant disregard by requiring properly acting parents to pay bills which, on the appropriate IEP, the town should have paid from the start, would offend the clear spirit of both the EAHCA and the Massachusetts statute. Possibly the parents' input would have resulted in a different IEP in the first place. In any event, it would be difficult to think

---

**4.** Contrary to defendant's claim, the complaint and papers throughout this case sufficiently raised, although perhaps not as clearly as would be desirable, a claim for reimbursement. If there has been any misunderstanding, the pleadings and/or pretrial order can be amend-

ed. There is no prejudice, as the questions are legal and not factual, and full opportunity for briefing has been provided. The court, indeed, would compliment the Attorney General on his brief, even though it largely does not agree with it.

of a better way to encourage committee irresponsibility. Nor, finally, does the court accept the argument that Junior was moved before the 1978, and subsequent, violations. The transfer followed a similar 1977 disregard. It was not a waiver for all time that the parents first tried to see if the 1977 IEP would work. Thus if, on the merits, the parents' placement is ruled to be the correct one, Westwood's exception to its general rule against reimbursement would permit recovery.

*Burlington Revisited*

The Court of Appeals remanded *Burlington* for determination of the correctness of the IEP. Now that it has been sustained, and the town declared not responsible for the 1979–80 through 1981–82 years, the father says that, nevertheless, and in spite of the seeming directions in the court's opinion, he should be reimbursed for his 1979–80 payments and the unpaid 1981–82 tuition, and should not have to reimburse the town for its 1980–81 and 1981–82 payments. Although only by reading *Westwood* as implicitly contradicting the *Burlington* court's opinion do these matters still seem open, we address his contentions.

The court believes a threshold question to be whether Michael's transfer to Carroll in September, 1979 contrary to the IEP, was a violation of section 1415(e)(3). This section provides,

> "During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then *current* educational *placement* of such child, ..." (Emphasis suppl.)

No question regarding this section was apparently raised in the district court until February, 1981. In connection with its then order that the town reimburse the father pendente lite for the 1979–80 tuition, (Appeal # 3), the district court, referring to this section, stated,

> "This mandatory provision, designed to preserve the status quo, has been held in this case to require that John Jr. be maintained at the Carroll School during the pendency of this litigation. Judgment and Memorandum of Decision November 19, 1980."

In fact, its November memorandum and order had not mentioned it. Rather, it had noted, for purposes of the state count, that the BSEA had held Carroll School to be the appropriate placement. Not only was the federal statute not mentioned, but the court did not address the factual circumstance that the ·father had transferred Michael to Carroll during the review process, after the IEP. A close reading of the *Burlington* opinion, in turn, indicates that the Court of Appeals also proceeded under the assumption that Carroll was the "current ... placement." The language of the opinion, and the recitation of the facts at the start, however, indicate that this was a mistaken impression of the facts rather thari a legal conclusion. Nor did anything turn on its correctness.

■ This court does not read section 1415(e)(3) as authorizing a parent to reject an IEP, unilaterally move the child to a private school, claim this to be the "current ... placement" from then on, and then, even when the transfer proves to have been unjustified, still expect the town to pay the bills. *See Stacy G. v. Pasadena Independent School District,* 5 Cir., 1983, 695 F.2d 949; *Stemple v. Board of Education,* 4 Cir., 1980, 623 F.2d 893, *cert. denied,* 450 U.S. 911, 101 S.Ct. 1348, 67 L.Ed.2d 334. This would be to turn inside out a statute designed to hold matters in abeyance, and to respect the existing placement.[5] To permit reimbursement when the parents, without excuse, unilaterally transferred the child to a private placement during the review process could only serve to encourage parents to disregard the statutory scheme; they would

---

5. It is true that in this particular case Michael's IEP proposed a transfer from one public school to another public school, so that, strictly speaking, there was no proposed "continued ... placement." However, the statute cannot be read in such circumstances to permit the parent, without town agreement, to choose some private school and confer thereon the imprimatur of continued placement.

have nothing to lose. The fact that in this case the transfer also ultimately proved incorrect only reinforces this conclusion.

■ Faced with this federal difficulty, and despite the fact that *Burlington* was not encouraging on the applicability of state law, the father would now rely on a state regulation, 603 C.M.R. § 504.5(f), which provides for reimbursement if a parent's placement contrary to an IEP is upheld by the BSEA. He argues that this regulation provides for reimbursement regardless of whether the BSEA decision for the parents is reversed by a court, in part reasoning that parents should be able to rely on the BSEA decision. This would seem to read too much into the regulation. The court does not believe that the state court would construe this regulation to permit reimbursement when the administrative decision has been reversed by a court on appeal, or, if it so reads, would give it validity. Indeed, if it should do so, the state rule would very likely be preempted by federal law.

The father would posit a different result with regard to having to repay to the town what he had received on account of the later years, asserting a letter from the Department's counsel, an assistant attorney general, construing section 1415(e)(3) in his favor. In addition to being a mere legal opinion, it was written long after he had incurred the expense. The Department was not only mistaken on the law, it would seem even more ill-advised in threatening the town with cutting off all its funds if it did not obey its order to make future payments for Michael to Carroll until the IEP was finally determined. This was not a case where the town was legally obliged under section 1415(e)(3) to continue payments preserving the status quo, but was an interference by the Department, supported by its economic power, enforcing an order · still subject to review. Certainly this could not be the basis for a final decision on liability. If the threat is to be regarded as other than wrongful, it could only be on the assumption that the payments were to be returned if the order was ultimately reversed.

The difficulty here is that the Department is in the comfortable position of not being itself accountable if proven to be in error. The Eleventh Amendment protects it even when, as a recipient and distributor of federal funds, it orders a town to make payments in violation of the federal act. *See Florida Department of Health & Rehabilitative Services v. Florida Nursing Home Ass'n,* 1981, 450 U.S. 147, 150, 101 S.Ct. 1032, 1034, 67 L.Ed.2d 132 (per curiam); *Edelman v. Jordan,* 1974, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662; *Miener v. State of Missouri,* 673 F.2d, ante, at 980–82. However, there is no reason why the town should be barred from obtaining repayment from the parent on whose behalf its funds were so spent by duress. This is a different case from *Westwood;* the payments were not only not owed, they were made involuntarily.

The court is not moved by the fact, with regard to repayment, that the state and federal act provide different standards of review. As was pointed out in *Westwood,* the federal act is the name of the game, and it cannot be that the BSEA is reversed and not reversed.

In *Burlington* there remains the question of the amount of the town's recovery. The court does not accept the argument that defendant parent is entitled to offset the town's so-called average cost per student. Rather, the burden will be on defendant to show the town's actual savings, such as marginal costs it would have incurred in any case, and funds received from the state for Michael's education. The case is continued for this purpose.

In *Westwood,* judgment is to be entered for the parents.

In *Wayland,* the town's motion for summary judgment is denied; the case to stand for trial on the merits of the IEP.